Good morning, and thank you. My name is Scott Camber, presenting for Appellant. Before we get into some of the more arcane facts of the error of the lower court, I think it's important to put context on the circumstances here. And that is that this is a case of Section 11, strict liability provided under the Securities Act, because at the end of the day, investors are recognized having a right to accurate information, in one place that clearly presents the facts regarding the public offering. In this case, investors had a right to accurate information in each of the three registration statements that are at issue here. These facts regarding the compensation and the relationship between the company and its executives, because there's a fundamental difference between receiving dollars now or receiving stock in the future. The registration statements made it very clear that the executives and their compensation were bullish, that they were bullish on the company and its futures, when in reality, the compensation that was provided to them in the form of loans secured only by stock options, gave them dollars now that they didn't have to wait on the contingency of the success of the company. Ultimately, those loans were never repaid prior to the bankruptcy of the company. First error I'd like to address is that the lower court should not have dismissed on statute of limitations ground any of the claims regarding the three registration statements. Firstly, with regard to the U. Barter registration statement, that was dismissed on statute of limitations grounds by implication. It was never specifically mentioned by the court. But the lower court held that the allegations were identical with respect to all of the Walker loans. They were identical from the prior complaint, which was upheld in this. In the lower court's order, the lower court held that there was a Form 4 registration statement that made the court change its mind and find that now these claims should be dismissed for statute of limitations. The problem with respect to the U. Barter registration statement, before I address the Form 4, is that the U. Barter registration statement mentions specific loans to Mr. Walker. Two loans specifically in excess of $1 million each, which were never part of any Form 4. They were never cited by the court, and it appears to be a complete disregard or oversight as to the record. The complaint goes through those that's no different from the prior time to this time. There is no basis for saying that they should be dismissed based on statute of limitations because there was never a Form 4 from which to measure discovery or notice to any member of the class and the named representatives. So I think this is, first and foremost, aside from anything else that you hear here today, this is an oversight and an error by the lower court, and it really is without explanation whatsoever. It was just dismissed. All of the Walker loans for each of the registration statements were just dismissed in their entirety without consideration that the loans for the U. Barter registration statement had nothing whatsoever to do with the Form 4. Now, with respect to the Form 4 itself, it was upon the Form 4 that the lower court decided to dismiss this complaint against the Network Commerce defendants. The court itself recognized in its order, which is in the record at 167, that the defendants had not identified, this is in the Underwriters Defendant Order, which was adopted in the Network Commerce Defendant Dismissal Order, that the defendants had not identified any material differences between the two complaints, the prior complaint and the current complaint, nor have defendants raised new arguments that would justify a different result regarding the existence of a duty, the potential to mislead, or the materiality of the omission. The court, therefore, adopts its prior rulings on these issues. Therefore, with regard to the Walker loans for both the IPO and the SPO registration statement, the only basis upon which the lower court predicated its dismissal was statute of limitations. And that statute of limitations argument was based entirely on the Form 4. And the timing of this. Counsel, the Form 4 relates only to the $52,000 and change loan. Is that correct? That is correct. Okay. Let's, we've got sort of two problems. One is, how would your clients have ever figured out that Form 4 was there? There's a second problem, which is, which goes to the question of materiality. What can you tell us about $52,000 on an IPO, SPO of this magnitude being material? What would have changed if somebody said, oh, my gosh, the guy's going to get another $52,000 on top of his salary. You know, I'm not going to invest in this company. It wasn't just the amount. In fact, in the pleading in our complaints, which is on record 135, paragraph 79, and that same paragraph appears in a number of instances. And it was found by the lower court to express materiality, not because of the amount of the loan, but because of the nature of the compensation. Instead of receiving stock options, this was compensation that was. . . Right. He was getting $400,000 in salary. He gets another $52,000 in loan. Let's suppose that they said, okay, you have $452,000 in salary. Those are dollars, not stock options. And you think that somebody would have blinked at investing in here because some guy was getting $452,000 instead of $400,000? I do, because it went to the very nature. It demonstrated it was a completely non-arm's-length type transaction. The type of the transaction it was, I mean, in today's day and age, you look at it and think, okay, well, the SEC rules wouldn't allow this or that. But at that point in time, it would have given an indication to the investors that the company was involved in non-arm's-length transactions. This was not secured. This loan was unsecured in any way, shape, or form except by the stock options. It demonstrated a lack of confidence of the CEO that those stock options were ever going to be worth something, that he basically secured this $52,000 loan with those stock options. And I think it goes to the very nature of that relationship. The lower court ruled affirmatively both last time prior to its – sorry. After the remand of this court to the lower court, the judge found that there was materiality and that the complaint did not sound in fraud. On a motion for reconsideration, the Network Commerce defendants raised the issue of materiality, and it was fully briefed. The lower court declined their motion for reconsideration on that issue. So your argument is it's the nature of the loan that if what they had failed to disclose was a $52,000 gift, probably no problem. It was. The board had simply said, we like the way this guy's doing his job. His regular salary is $400,000. We're going to give him another $52,000 because we like the guy. I think if that was – I think that would be less – I think that would be less problematic. It would be technically a misstatement. But I think here, the Walker loans in a vacuum are difficult. I mean, we're considering them in seriatim here. It's the Walker loans, it's the executive compensation, it's the Ubarter merger. But in reality, the Walker loans and the executive compensation are in some ways part and parcel of each other because how they dealt with Walker on this $52,000 loan was the same way they wound up dealing with all of the other executives with respect to other loans. With other loans, and in particular, later on in the Ubarter transaction, there were two $1 million loans to Walker that were handled in exactly the same way. And it is – But the dollar value has to have some impact. I mean, the question asked under 10B and same standard as under Section 11 is, you know, could there be a substantial likelihood that if the investor knew that this was an unsecured loan of $52,000 added to the compensation package, would that have made a difference? And I'm still having some trouble because that then takes into account the nature, which is your argument. But there also is a dollar value and the overall package of what is the compensation and what's the size of the IPO. So I'm still having a little trouble putting materiality on it. Yeah, I mean, I will refer to – it's in the record 173 through 178 that the lower court's – using the lower court's language for addressing it is, plaintiff's allegations regarding the failure to disclose the Walker loan in the three registration statements, the effect that failure had on defendant's statements regarding executive compensation, the intended use to which money is raised would be put, the relative benefits of the loans and the lockup provisions and the materiality of those statements and omissions adequately state a claim under Section 11. I mean, the nature of the $52,000 as part and parcel of demonstrating the way the company dictated its – had its relationship with its executives. It would be, for instance, if a company were to say that it was – it made an extra half million dollars, then let's say the company had $10 million or $100 million in earnings. Maybe the extra half million dollars wouldn't matter. But if you knew that that half million dollars was found because they cheated their salespeople out of commissions for that extra half million dollars, it would be more material than the half million dollars itself. It would be the nature of how it dealt with its own salespeople, which may make an investor think, why would I want to invest in that company? And I think in this situation, we were dealing with an Internet company in the late 90s. And in a situation with how it dealt with its executives, whether it be on an arms-length basis or not, and I think in that way it really did matter. And I think as the Walker loan is a bit of a tip of the iceberg here, is that it is demonstrative of the other ways in which the executives were compensated in ways that were not disclosed in the registration statements. It began as that $52,000 loan. It ended with several million dollars of loans by the time the Ubarter transaction. In some ways, it was a canary in the coal mine for demonstrating this relationship and demonstrating what the company was willing to do for its executives and how the relationships with those executives were made. In the Form 4 itself, from a statute of limitations perspective, that issue, interestingly, was fully briefed. Although not discussed in the initial dismissal prior to the last appeal, it was briefed and it was never commented on by the lower court. This time on the dismissal, the court found that the Form 4 was sufficient to trigger inquiry notice for the investors and start the statute of limitations running. I think that that goes somewhere that this court has not, and to my knowledge no other court has, saying that there should be constructive notice based upon a Form 4. Certainly there have been cases that demonstrate constructive notice and inquiry notice from other SEC filings. But it's important to realize, and it was discussed at oral argument in the lower court, is that the Form 4s in 1999 were not what we know of as the SEC website today. This was not information that was readily available. This was something that you would have to write to or manually get from the SEC. It was not available by the Internet. Not one analyst that followed the stock ever cited information. That cannot be really a standard because you wouldn't have had any of these lawsuits pre-Internet which really didn't come into public play until the mid-1990s. You would never have had a prior defense on those lawsuits where you filed registration statements. So I'm not sure how the Internet changes the game here. Well, I think the way it's, I mean, registration statements, I mean, throughout all the case law, registration statements by their nature are required to be stand-alone documents. They have to provide all the accurate information in one place. I don't hear it as a situation that they're trying to say, the defendants have said, oh, the Form 4 included a footnote which referenced the loan. It did not contain all the information in our complaint. That's a different argument than the accessibility argument. That's a substantive argument of the nature of what's in the Form 4. I guess the accessibility, for instance, some of the cases out there say that if a 10-K was sent to you, an annual statement was sent to you, then you could be put on inquiry notice for the contents thereof. The opposite of that would be a Form 4. Yes, it was something that was filed by the SEC, but that type of filing pre- or post-Internet has never been a basis for finding constructive or inquiry notice. It is something that is not, was not readily available to investors then. Even now, when it is readily available to investors, it hasn't been relied upon by any court, to my knowledge, to provide inquiry or constructive notice. Let me ask one quick question, and if we need to, I'm sure we'll give you a little extra time, but on the million-dollar loans that didn't get dealt with, were they brought up to the court on a motion for reconsideration at all? They were not. Okay. No, they were not. It was our judgment that given the scope and given that this is, you know, our second trip up here on a motion to dismiss, we determined that it would be better to address everything in one place. Okay. Well, you're well under your three minutes, but we'll give you a little bit of time for rebuttal. Okay. Thank you. No, you are, if you want to keep talking, you're going to use up all your time. Oh, I'm sorry. Okay. Let me, that's fine. Let me take up the rest of the non-rebuttal. Forty-five seconds. Okay. Let me take up the rest of the non-rebuttal for that rebuttal time. Thank you. Thank you. Counsel? Good morning, Judge Bivey. Welcome back to this case. You'll recall you were on the panel that sent us back down post-best. Let me make one just quick observation. No good deed goes unpunished. Yes, like a bad penny turning up. Let me just make one quick observation about the $52,000 loan, and I don't think it was a deliberate mischaracterization, but I think perhaps a misapprehension by Mr. Canberra, and that's this. I guess I should say who I am. I'm Stillman Connell, DLA Piper. You know that. With me here is my colleague, Patrick Jordan, who's helped me dust this case off after a couple years. On the $52,000 loan, remember what it was used for. It was used for Mr. Walker so he could convert his options into actually owning the stock. This isn't running away from the company. This is investing in the company. So this notion that somehow some even grander disclosure than publicly filing it under a Form 4, which was the way it was done in those days, and indeed it's the way it's done these days, would not have, even if we put it up on a billboard, it wouldn't have changed the fundamental fact here, and that is Mr. Walker was taking a stake in the company that he didn't have otherwise. I'm going to start out on an area that wasn't briefed very heavily, but it was briefed, and it's important because it deals completely with the u-barter issue. It's a standing issue, and I start with it because standing is a fundamental concept. It's a threshold issue. Plaintiffs, as you know from the cases we've cited and probably from your familiarity with other cases, you understand plaintiffs have to plead in a Section 11 case that they have standing to bring the claim. There's the whole issue of traceability to the particular registration statement. Plaintiffs haven't done this in the case of the u-barter transaction, and they can't do it, and here's why. This argument is kind of summarized. If you look at docket 176, pages 15 through 16, you'll see another synopsis of this, but let me go to the core of it. The core is this. Plaintiffs submitted certificates because they have to now under the PSLRA. They submitted certificates that show when plaintiffs bought. There are six named plaintiffs. You'll find those certificates at supplemental excerpts of record 6 through 22. Only one plaintiff bought after the date that the u-barter merger closed. That one plaintiff is Mr. Levy. His stock ownership is explained in the complaint at paragraph 16, which says nothing about u-barter. Contrast that with paragraphs 12 and 13 of the complaint in which there are specific allegations in which plaintiffs link particular named plaintiffs to the IPO and link particular named plaintiffs to the SBO. The complaint is devoid of any such linkage. Plaintiffs' only response on this point to date has been to say, look at paragraph 143, and I invite the panel to do that. The panel will see that that paragraph deals only with the class of plaintiffs they want to represent if they have standing to even bring the case in the first instance by finding a named plaintiff who can bring that claim. Panel, here's why they're not going to be able to do that. There were already over 15 million shares on the public float by the time of the u-barter registration statement. The chances that they're going to find somebody who in the aftermarket just happened to buy a share that's traceable up to the u-barter transaction, which was a relatively small issuance of shares, is slim to none. And indeed, under Rule 11, I don't think they're ever going to get there. They're never going to be able to plead it, and they haven't pled it yet. The effect is on this fundamental threshold issue, the u-barter claim should be dismissed. I want to talk a little bit about the statute of limitations issue, and what I really want to focus on isn't the substance. I think the substance is well-briefed. I appreciate the questions that have been asked already. I'm happy to answer more questions, but I want to talk here about a fundamental failing that the plaintiffs suffered that don't even let them get to the point of challenging the Form 4 notion, and it's this. They have waived their ability to respond to that argument. Here's how that happened. The district court dismissed both the loan and the plan claims because, among other reasons, plaintiffs hadn't filed within one year of the filing of the Form 4. We believe the district court's ruling is sound, and it should be affirmed on the substance, but on top of that, plaintiffs waived any argument about that, and they did it in this way. A major point of the defense briefing on the second round of motions to dismiss was the Form 4. Plaintiffs have said, well, wait a minute. We're trying to incorporate by reference some stuff that happened in Round 1. If you go back and look at that briefing, you're going to see they are not making the argument that they're trying to make now that the inquiry notice standard was not satisfied somehow by the Form 4. They did not make that argument in the first round of briefing. All they said in the first round of briefing is, gee, you can't really tell what this Form 4 says. Well, Judge Lasnik properly rejected that argument, and I think the panel would too, but what happened on a procedural level, an important procedural level, is this. Judge Lasnik then in his order said, plaintiffs, you didn't respond to this argument. It was briefed on the second motion to dismiss. You just didn't respond to it. What do you have to say? That oral argument, Mr. Camber got up and made a gallant attempt to say something, but the fact is he didn't support it with any authority. He didn't support it with any facts, and under the Lear decision, 844, Fed Second, 634, the failure of plaintiffs to mount a challenge to that has acted as a waiver. Now, when Judge Lasnik made the decision that they hadn't adequately responded to it and for that reason he was going to grant it in addition to the substantive reason, he was operating within his discretion. What that means is for the panel to flip Judge Lasnik on that point, they would have to find an abuse of discretion in Judge Lasnik finding that the plaintiffs hadn't adhered to the rules of the district court in failing to raise a defense to the issue. And I don't think, well, A, even if it weren't an abuse of discretion standard, I think it's important for the panel to support Judge Lasnik on this and affirm him, but if we accept that it is an abuse of discretion standard, then I think all the more it's evident that what Judge Lasnik did is correct procedurally on the Form 4 issue, even before we get to the substance of the Form 4 issue. Plaintiffs have made an attack on Judge Lasnik because they note that he says in one of his orders, the sole example of the plan was the $52,000 loan. And plaintiffs say, well, we buried, because actually plaintiffs themselves, if you look at paragraph 68, you'll see why Judge Lasnik said that. At paragraph 68 of the complaint, plaintiffs say their example of the plan is that $52,000 loan. It is true. Buried back in the complaint at paragraph 105, separated by some 40 paragraphs from paragraph 68 where they talk about the plan, is the notion that supposedly there were two other loans given to Mr. Walker at the end of May and the beginning of June. For several reasons, that's not going to get the plaintiffs, I think, past this appeal. And let me start with this. The plan is a unitary plan. There wasn't, according to plaintiff's complaint, a plan related to view barter transaction and a plan related to the IPO and SPO transactions, which is to say if the plan is, as Judge Lasnik correctly found, a forward-looking statement and related to forward-looking statements and is only false or misleading if it made other forward-looking statements, because we're talking about plan, future compensation. Judge Lasnik carefully went through that and said, what plaintiffs are really talking about here on the plan is looking into the future. I'll tell you what's bothering me, Counsel, is how do you file a statement and then three weeks later offer a couple of million-dollar loans and not have known at the time that you filed the statement that you intended to do that? What's interesting, Your Honor, is this. Plaintiffs would have you believe that they've alleged that in the view barter registration statement there's something said about the future use of proceeds. There's not. Why isn't there? There's not because... Excellent question. Gives me a great forum here to cleanly deal with this issue. I hope to answer the question. There's not because there were no proceeds gained in the view barter transaction. The view barter transaction was network commerce issued some stock to a company called view barter in exchange for its stock. It was a stock-for-stock transaction. So there is no statement in the view barter registration statement that could have been made false by failing to omit a plan for future compensation. Did Walker get a pair of million-dollar loans just three weeks after you filed a public registration statement? We have to assume he did because that's what plaintiffs have alleged. But the question is, under Section 11, you have to parse the Section 11 registration statement. Was there anything said in the Section 11 registration statement that was rendered false or misleading by not talking about those loans? The Section 11 registration statement, Your Honor... Let me give you a little different hypothetical. Let's suppose that at the time that we issued the public registration statement, we knew full well that in three weeks we intended to offer the CEO a million-dollar loan. Do you have a duty to disclose that? No, not under the particular circumstances here. In other cases you might. Here you don't because network commerce in the IPO registration statement and the SPO registration statement had said in bold terms, we've raised, whatever it was, $150 million in those two offerings and our use of proceeds is going to be as follows. Then there are wide berths of discretion for how that money is going to be spent, including compensation, overhead, everything. It was broad enough to cover any compensation decisions that might have been made. The only thing, Your Honor, that's said about compensation in the Ubarter registration statement is what Mr. Walker was paid in 1999. If you look at what plaintiffs quote in their complaint, all that's said about compensation is what was paid in 1999 and a note that Mr. Walker's salary can be adjusted at the whim of the board starting in 2000 at any point. Now, any reasonable investor reading that and actually paying attention to it would understand they have no representation as to what Mr. Walker's current compensation is or what it might be in the future. All they know is that in that money that was raised in the IPO and the SPO registration statements, the company has very wide discretion. And Judge Lassley looked at that and said, investors, you are warned of this. You are warned that compensation decisions could be made in the future and the company has very wide discretion. And as I said, the only thing that's underlined on that point in the Ubarter registration statement is the specific notation that the board has unbridled discretion to set compensation or reset compensation for Mr. Walker starting any time in the year 2000. It does seem to be a little different, though, when he's offered a loan just three weeks after you file the statement that more than doubles his salary. But we still have to find a statement in the registration statement that was rendered in the Ubarter registration statement that was rendered misleading. It's an omission. It's an omission from what you represented before, which is that when you see what his salary was in 1999, that it was $400,000, you have a regular reader, I think, has some entitlement to be able to say, well, it was $400,000. That means that it won't be $25 million next year. The fact that the board can raise it doesn't say that it relieves the board of any responsibility to act sensibly. And when you know that three weeks later they're going to give him a million-dollar loan, two-and-a-half times his annual salary, and on the hypothetical that I gave you, that it was known at the time that they were going to give him a loan of two-and-a-half times his annual salary, seems like it might have been something that would have been worth disclosing. It would have been if somebody had bothered to perhaps write into the Ubarter registration statement, here's exactly what we're going to pay Mr. Walker now, and here's what we're going to pay him in the future. The Ubarter statement is devoid of that. What is in the Ubarter statement, because as Judge Easterbrook held in the WIEGLOS, W-I-E-G-L-O-S, decision, the prior risk warnings are incorporated into later registration statements that are within a reasonable period of time, and clearly Ubarter came on the heels of the SPO and the IPO. What the investor knows, who is actually paying attention, and that's the standard we're using here, is that a lot of money had been raised, the company had complete discretion on how it was going to be spent, and there was not one representation made that the company wouldn't increase Mr. Walker's pay substantially, and indeed flagged the fact that the board had the discretion, the power, the authority to do that. So under the circumstances here, Your Honor, you have to go back. I mean, the whole exercise in Rule 11 is go to find something in the registration statement that's made false or misleading, and that's what plaintiffs can't do here with respect to those supposed $2 million payments. Beyond that, let's remind ourselves of this. This is all future-looking stuff. If anything would have been made misleading, it would have been something that was talking about future compensation. If they had already decided to do it, it's not in the future. Right. That was the hypothetical. Well, here's what's missing from the complaint. There is nowhere an allegation that says there was a contract entered into with Mr. Walker that bound the company to pay the guy, actually it wasn't a payment, it was a loan, to loan the fellow $2 million in the future. Judge Leisnick got it right. The issues about compensation are all future-looking. Everything about the compensation is about what might happen in the future, and that has... Even if they had a hand... they wouldn't need a contract. What if they had a handshake deal? As soon as we get this... I wouldn't quibble, Your Honor. Get this offering closed, and we're going to go with it. If it was a handshake deal, it was a handshake deal. It was a contract. That's not what's pled. Some vague, ephemeral plan is pled about what might be paid in the future, and it's devoid of specifics to the point that you couldn't say even if there was a handshake deal. You couldn't find that. You couldn't conclude that reasonably from the complaint. What is the implication of that about it being forward-looking? First, under the safe harbor, the risk warnings were there, so it's a protected statement unless there's actual fraud. And in fact, let's remind ourselves of this, as we explained in our response brief on the appeal. Everything except for the $52,000 loan that plaintiffs are attacking is a forward-looking statement. Under the safe harbor, if you're going to attack a forward-looking statement, you have to plead actual fraud. That's what Congress decided. Some people think what Congress did was silly, but here's what they said. If you're going to attack a forward-looking statement, even if you don't have risk warnings, if you're attacking a forward-looking statement, you have to plead and prove that the statement put into the registration statement, and I'm quoting, quote, was made or approved by such officer with actual knowledge by that officer that the statement was false or misleading. You need to wind up. Winding up, Your Honor. There are a lot of reasons. There are too many reasons for me to cover even today on why Judge Lasnik got it right. The fact is he's kind of an expert on this case. He's had it for quite a while. Plaintiffs have had now four times to amend the complaint, and they've taken advantage of that. I think it's time now to bring the case to a close with a dismissal with prejudice. Judge Lasnik explained that further amendment would be futile. Plaintiffs haven't explained why that would not be the case. We do think it's futile, and indeed under the court's prior iteration of dealing with this case, what this court said was, we'll take the non-fraud allegations. Plaintiffs, you can take that back down and see if any of the non-fraud allegations can survive. The fact is the complaint's really all about forward-looking statements. Those can only be pled under the safe harbor as true fraud. Thank you. Okay. Rebuttal? Two minutes. Thank you, Your Honor. Let me start where we just had left off, and that is the forward-looking statements are not forward-looking at all. These were false at the time of the statement. They weren't forward-looking. The question regarding compensation, the questions regarding the knowledge about the U-barter merger and the facts, it is pled that those were facts at the time of the registration statements. They were not forward-looking at all. As Mr. Connell has ---- Can we be more specific just so I know where to look? The allegations that you claim challenged the forward-looking aspect of the compensation are which? Yes. They would be at the record on page 141 through 144, which is paragraphs 99 through 114. Thank you. And those paragraphs also, I think, make very clear that it is pled what the omission was and where the omission was with respect to executive compensation. It provides the executive compensation paragraph, and following it, it says the preceding statements were materially false and misleading because they failed to disclose all facts relating to undisclosed executive compensation.  $1 million each immediately prior to and on the same day as the company's announcements that the U-barter merger was completed. If one was to even look under the ICPAL standard of plausibility, one can certainly believe that it was plausible that those statements were false at that time and that there was an understanding with Walker, or at least things were in motion to have those loans completed. Addressing the tracing issue very quickly, there are paragraphs that are pled that the lower court rejected the tracing argument. It is pled at the record on page 148, paragraph 143. Other decisions of this court have said that such tracing specific to each plaintiff only needs to be made prior to the time of class certification and is not necessary on a motion to dismiss. We're over your time. I thank you very much. And I would just want to conclude in saying that it can't be futile to amend here because at the end of the day there is a complaint on record and an answer to that complaint. It is not a situation where we're asking to do anything but to revert to the pleading that existed before. Thank you. Okay. The case just argued will be submitted for decision. Thanks to all of you for your arguments.
judges: Hawkins, McKeown, Bybee